# Exhibit 16



# In The Supreme Court of Bermuda

**CIVIL JURISDICTION**

**(COMMERCIAL COURT)**

**2021 NO 107, 108, 109, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 123, 124, 125 & 126**

**IN THE MATTER OF JARDINE STRATEGIC HOLDINGS LIMITED**

**AND IN THE MATTER OF THE AMALGAMATION AGREEMENT BETWEEN JMH INVESTMENTS LIMITED AND JMH BERMUDA LIMITED AND JARDINE STRATEGIC HOLDINGS LIMITED**

**AND IN THE MATTER OF SECTION 106 OF THE COMPANIES ACT 1981**

| | |
|---|---|
| **Before:** | **Hon. Chief Justice Hargun** |
| **Appearances:** | **Mark Howard QC, Stephen Midwinter QC, Mark Chudleigh and Laura Williamson of Kennedys Chudleigh Limited, Matthew Watson of Cox Hallett Wilkinson Limited, Delroy Duncan QC and Ryan Hawthorne of Trott and Duncan Limited, and Lilla Zuill of Harneys (Bermuda) Limited for the Plaintiffs.** |

**Jonathan Crow QC, Martin Moore QC and John Wasty of Appleby (Bermuda) Limited for Jardine Strategic Holdings Limited and Jardine Strategic Limited**

**Dates of Hearing: 22-23 February 2022**

**Date of Judgment: 20 April 2022**

**JUDGMENT**

*Application to appraise the fair value of the shares under section 106(6) of the Companies Act 1981; whether a shareholder who acquired shares after the notice of such amalgamation has the locus standi to make the application; whether such an application an abuse of process; whether fair value to be assessed on an objective or subjective basis*

**<u>HARGUN CJ</u>**

**A. Introduction**

1. This is an application by Jardine Strategic Holdings Limited and Jardine Strategic Limited ("**the Company**") to strike out the appraisal claims for fair value of the shares under section 106(6) of the Companies Act 1981 ("**the Act**") of certain Plaintiffs ("**the Dissenting Shareholders**") who were not shareholders of the Company when the Company notified the shareholders of the meeting pursuant to section 106(2) of the Act ("**the Notice**") to consider and vote on a resolution to approve an amalgamation between the Company and JMH Bermuda Limited ("**the Amalgamation**") or when the Company first announced the proposed Amalgamation ("**the Announcement**"). For practical purposes the Company seeks to strike out the claims of those Dissenting Shareholders who acquired the shares after the date of the Notice (or after the date of the Announcement), with the knowledge

2

that the Amalgamation was a foregone conclusion and acquired the shares as an arbitrage opportunity.

2. The application is made by Amended Summons dated 30 November 2021 which seeks an order in the following terms:

> "*An Order pursuant to Order 18, rule 19(1)(a) and/or rule 19(1)(d) striking out the originating summons of the Plaintiff to the extent that the Plaintiffs seeks relief as the shares in the First Defendant in respect of which it held not the legal title **nor a beneficial interest** as at 17 March 2021 (**the Short-Term Shareholders**) on the grounds that such originating summons discloses no reasonable cause of action or is otherwise an abuse of the process of the court.*"[1] (emphasis added)

3. Fundamental to this application is the Company's contention that it is not open to a party to "buy in" to an amalgamation for the purpose of pursuing an appraisal action. The Company contends that the purpose of an appraisal is to provide a remedy to pre-existing shareholders who are locked into a fundamental change in the corporation which is proposed after they acquired their shares. The Company maintains that its purpose is manifestly not to provide opportunities for hedge funds to conduct arbitrage through the court's process by acquiring shares after a proposed transaction has already been announced.

4. The Company submits that the claims of the Dissenting Shareholders should be struck out on three independent grounds.

5. First, by its terms, section 106(6) of the Act is a remedy available only to shareholders who were given Notice of the amalgamation meeting and, by that Notice, were offered fair value for their shares. Neither is applicable to a shareholder who acquired his shares after the

---

[1] The Amended Summons was Re-Amended by inserting "8 March 2021 and/or" before "17 March 2021"in the above paragraph.

date of the Notice (or, as appropriate, the date of the Announcement) ("**the Short Term Shareholders**"). The Company maintains that this is a hard-edged question of statutory locus.

6. Second, even if section 106(6) were to confer standing on shareholders to whom no offer was made, the appraisal actions commenced by the Short Term Shareholders in this case, who bought shares in the knowledge that those shares would then be compulsorily acquired, are an abuse of the court's process.

7. Third, even if section 106(6) were to confer standing on that wider class of shareholders, the court at trial would inevitably find that the fair value of the Short Term Shareholders' shares is no greater than US$ 33.00 per share. It follows that the Short Term Shareholders have already received all that they could obtain at trial. The Company maintains that their claims have no real prospect of success and/or the continued prosecution of those claims is a further abuse of the court's process.

8. The Dissenting Shareholders' position is that section s.106(6) is a simple provision that means what it says: any shareholder whose shares are to be acquired or cancelled can request an appraisal of the fair value of those shares provided that shareholder (i) did not vote in favour of the amalgamation or merger and (ii) is not satisfied that it has been offered fair value for its shares. Further, an application must be filed within one month of the issuance of the notice of meeting. The Dissenting Shareholders contend that they all fulfil those criteria: they did not vote in favour of the amalgamation, they are not satisfied that they have been offered fair value for their shares, and they issued applications within one month of the notice of meeting. They are therefore entitled to exercise the right to request appraisal and thereby ensure that they are paid fair value for the shares that have been taken from them. There is nothing in s.106(6) (or any other provision), argue the Dissenting Shareholders, that restricts the meaning of "any shareholder" to a shareholder who acquired his shares before the notice calling the meeting at which the merger or amalgamation was to be approved was issued.

### B. Background

9.  The background to these proceedings and the Amalgamation is set out in the First Affidavit of Jeremy Parr (dated 10 September 2021), the Group General Counsel. Mr Parr explains that Jardine Matheson Holdings Limited ("**Jardine Matheson**") is a company limited by shares and incorporated in Bermuda. It has as its primary listing a standard listing on the Main Market of the London Stock Exchange. It also has secondary listings in Singapore and Bermuda.

10. Prior to the Amalgamation, amongst other interests in the Jardine Matheson group of companies ("**Group**"), Jardine Matheson held, indirectly, approximately 84.9% of the shares in the Company. Prior to the Amalgamation, the Company was also incorporated in Bermuda and had as its primary listing a standard listing on the Main Market of the London Stock Exchange. It also had secondary listings in Singapore and Bermuda.

11. The Group is comprised of a broad portfolio of businesses operating principally in China and Southeast Asia. Across the Group, over 400,000 employees work in a wide range of businesses in sectors including motor vehicles and related operations, property investment and development, food retailing, health and beauty, home furnishings, engineering and construction, transport services, restaurants, luxury hotels, financial services, heavy equipment, mining, and agribusiness.

12. The Group's structure included a cross-holding structure between the two listed companies. The Company owned, directly and indirectly, 59.3% of the shares in Jardine Matheson. In addition, the Company held most of the Group's major listed interests, including, for example, approximately 50.4% of Hong Kong Land Holdings Ltd, 77.6% of Dairy Farm International Holdings Ltd, 79.5% of Mandarin Oriental International Ltd and 75% of Jardine Cycle & Carriage Ltd.

13. On 8 March 2021, the Company and Jardine Matheson announced plans to simplify the structure of the Group. In summary, the planned simplification would involve (1) the

acquisition by Jardine Matheson, for cash, of the approximately 15% of the issued share capital of the Company that it did not already own directly or indirectly and (2) the subsequent cancellation by Jardine Matheson of the Company's almost 59% shareholding in it. The present claims by the Dissenting Shareholders are concerned with the first of those two steps.

14. The acquisition was implemented by way of an amalgamation under the Act. Under Bermuda law and the Company's bye-laws, the Amalgamation required the approval of at least 75% of the votes cast by shareholders in the Company. Jardine Matheson had undertaken to the Company that it would vote and would procure that its wholly owned subsidiaries would vote the 940,903,135 shares (representing 84.89% of the existing issued share capital of the Company) in favour of the resolution. The requisite approval was therefore certain to be secured.

15. Under the terms of the Amalgamation, shareholders in the Company (other than Jardine Matheson and its wholly owned subsidiaries) were entitled to receive US$ 33.00 in cash for each ordinary share which they held in the Company ("**the Acquisition Price**"). Mr. Parr states that the Acquisition Price valued the shares at US$ 5.5 billion, representing a premium of approximately: (i) 20.2% to the closing middle market price of US$ 27.45 per share on the Singapore Stock Exchange on 5 March 2021; (ii) 29% to the volume-weighted average closing middle market price of US$ 25.58 per share on the Singapore Stock Exchange over the one-month period ended 5 March 2021; and (iii) 40.3% to the volume weighted average closing middle market price of US$ 23.53 per share on the Singapore Stock Exchange over the six-month period ended 5 March 2021.

16.  As a number of the directors of the Company were also directors of Jardine Matheson, the Company's board delegated responsibility for considering the Amalgamation to a committee of directors who were not also directors of Jardine Matheson ("**the Transaction Committee**"). The members of the Transaction Committee were Lord Powell of Bayswater, KCMG and Mr Lincoln KK Leong.

17.  The Transaction Committee, advised by Evercore Partners International LLP as to the financial terms of the Amalgamation, considered the terms of the Amalgamation to be fair and reasonable so far as independent shareholders in the Company were concerned. At the General Meeting of the Company held on 12 April 2021, a resolution approving the Amalgamation Agreement was passed. The Amalgamation became effective on 14 April 2021.

18. On 12 and 15 April 2021, 18 originating summonses were filed in relation to the Amalgamation. By those summonses, the Dissenting Shareholders seek appraisals pursuant to section 106(6) of the Act to determine the fair value of their shares in the Company.

19. There are 87 Dissenting Shareholders who are the Plaintiffs in these proceedings. According to the Company, they fall into two categories:

(a) Those who held shares in Jardine Strategic, whether directly or through depositaries and/or nominees, at the time that the Notice was given (or when the Announcement was made). The Company refers to them as the **Long Term Shareholders**. The Company maintains that these are the persons whom section 106(6) is designed to protect and who may properly pursue an appraisal.

(b) Those who acquired shares after the date of the Notice (or the date of the Announcement), with knowledge that the Amalgamation was a foregone conclusion, and who acquired those shares as an arbitrage opportunity. As noted from the Amended Summons, the Company refers to the shareholders as the **Short Term Shareholders**.

20. According to the Company, included in the category of Short Term Shareholders are a number of event-driven hedge funds accustomed to undertaking appraisal arbitrage in other

jurisdictions. By way of example, Maso Capital Investments Ltd and Blackwell Partners LLC, two of the Short Term Shareholders in this case, were also the dissenting shareholders in a number of recent Cayman Islands appraisals.

21. According to the Company's analysis, approximately 84% by value of the Plaintiffs are Short Term Shareholders who acquired shareholdings in the Company after the date of the Notice and in the knowledge that the Amalgamation would take place and for the sole purpose of pursuing these proceedings.

**C.  Ground 1: The proper construction of section 106**

22. Section 106 of the Act, so far as it is relevant to this application, provides as follows:

> *"106 (1) The directors of each amalgamating or merging company shall submit the amalgamation agreement or merger agreement for approval to a meeting of the holders of shares of the amalgamating or merging company of which they are directors and, subject to subsection (4), to the holders of each class of such shares.*
>
> *(2) A notice of a meeting of shareholders complying with section 75 shall be sent in accordance with that section to each shareholder of each amalgamating or merging company, and shall –*
>
>> *(a) include or be accompanied by a copy or summary of the amalgamation agreement or merger agreement; and*
>>
>> *(b) subject to subsection (2A), state –*
>>
>>> *(i) the fair value of the shares as determined by each amalgamating or merging company; and*
>>>
>>> *(ii) that a dissenting shareholder is entitled to be paid the*
>>>
>>> *fair value of his shares.*
>
> *...*

*(3) Each share of an amalgamating or merging company carries the right to vote in respect of an amalgamation or merger whether or not it otherwise carries the right to vote.*

*...*

*(6) Any shareholder who did not vote in favour of the amalgamation or merger and who is not satisfied that he has been offered fair value for his shares may within one month of the giving of the notice referred to in subsection (2) apply to the Court to appraise the fair value of his shares."*

### The Company's case on the meaning of section 106

23. This section sets out the submissions made on behalf of the Company as to the proper meaning of section 106 in the context of this application. This section does not, unless indicated otherwise, set out the findings and/or conclusions of the Court.

24. The Company refers to section 106(2) noting that it requires the giving to shareholders of notice of the meeting at which the amalgamation agreement is required to be submitted for approval. Section 106(2)(b) stipulates that the notice shall state the fair value of the shares as determined by the amalgamating or merging company and that a dissenting shareholder is entitled to be paid the fair value of his shares.

25. The Company argues that section 106(6) is built around the notice, which both fixes the temporal deadline and constitutes the "*offer*" with which a shareholder may or may not be satisfied.

26. The basic scheme of the legislation, argues the Company, is thus:

    (a) First, notice is given to shareholders, and, within that notice, an offer is made to its recipients.

9

(b) Second, **recipients of the offer** who do not support the proposed transaction have four weeks within which to consider the offer. During that period, they may elect to accept the offer or, if they are not satisfied with it, to apply for an appraisal.

27. In that respect, the Company contends, section 106(6) stands well apart from the appraisal regimes adopted in other jurisdictions. In Bermuda, unlike elsewhere, the remedy is linked inextricably to the giving of notice, and the making of an offer, under section 106(2):

(a) The legislative regimes in other jurisdictions either do not contain a notice provision equivalent to section 106(2) at all or, if they do, the appraisal remedy is not linked to it.

(b) Importantly, those other regimes do not require the company to make an offer when giving notice, and do not tie the appraisal remedy to the making of that offer. In other words, the scheme identified in [26] above is simply not present. Instead, where an offer is to be made, it is made later in the procedure to a dissenter who, by that stage and by definition, has standing to obtain relief.

28. Section 106(6) provides that **[A]** any shareholder **[B]** who did not vote in favour of the amalgamation and **[C]** who is not satisfied that he has been offered fair value for his shares **[D]** may apply for an appraisal within one month of the giving of the notice referred to in section 106(2).

29. The Company maintains that no issue arises as to the meaning of the term "*shareholder*", which refers to a "*member*", i.e. a person whose name is entered on the register of members.

30. Likewise, no issues arise as to the "*who did not vote in favour of the amalgamation*".

31. The Company states that the words "*who is not satisfied that he has been offered fair value for his shares*" impose a condition precedent. The Company submits that it is clear from the words used that the draftsman envisaged that those claiming relief under section 106(6) would be those **to whom an offer under section 106(2)(b) had been addressed**.

32. The Company maintains that any argument based upon the proposition that it was a general offer by the Company to all the shareholders whose shares were the subject of acquisition by the Company does not entitle such a shareholder to bring an appraisal action in accordance with section 106(6) of the Act. The Company argues that in accordance with section 106(2), the Notice was required to be sent "*to each Shareholder*", which can only mean each shareholder at the time that notice is given. That is what in fact happened. The "*offer*" was made by sending the Notice to those shareholders. Neither the Notice nor the offer was addressed to subsequent transferees. A company gives notice to those entitled to receive notice, i.e. those whose names appear on the register of members at the relevant time. It does not give further notice to subsequent transferees of shares.

33. The Company also argues that the fact that all the shareholders who acquired shares after the date of the notice under section 106(2)(b) were entitled to vote at the meeting is irrelevant to the issue whether they can maintain an action under section 106(6) of the Act. The Company contends that the fact that all the members were entitled to vote at the meeting, including those who acquired shares after the date of the Notice, says nothing about the persons to whom the Notice, and the offer contained within it, were addressed. It is almost invariably the case under companies' constitutions that those holding shares at the record date are entitled to exercise the rights attaching to their shares by voting at the meeting, even though they may have acquired their shares after the date of the notice convening the general meeting. It does not follow, the Company argues, that the notice, or any offer contained within it, was **addressed** to them.

34. The Company states that there is also a dispute as to the words *"within one month of the giving of the notice referred to in subsection (2)"*. The Company's case is that these words should be taken to qualify the words "*Any shareholder*". In other words, any shareholder

11

may, within one month of the giving to him of notice under section 106(2), apply under section 106(6). The Company says that it is significant that the period within which any application must be made is not fixed by reference to the general meeting at which the Amalgamation Agreement is approved: rather, it is fixed by reference to the giving of notice, because it is the notice that contains the relevant offer.

35. The Company argues that the interpretation of section 106 set out at [24] to [34] above gives effect to **the purpose** of section 106(6) and Part VII of the Act as a whole. The Company contends that the purpose of section 106(6) is to protect shareholders whose shares are taken against their will, or who have suffered a fundamental change in the business in which they invested, from oppression. The Company contends that its contention as to the purpose of section 106(6) is supported by a wealth of extraneous material from other jurisdictions which would evidence the intention of the legislature (including in relation to the Canada Business Corporations Act – from which the Bermudian legislature drew heavily: *Kawaley, Offshore Commercial Law in Bermuda* (2nd ed) at 10.59).

36. In support of its contention as to **the purpose** of section 106(6) the Company relies upon the "Dickerson Report: Proposals for a New Business Corporations Law for Canada" (1971), Vol. 1 ("**the Dickerson Report**") at page 115:

> *"Instead of relying on common law standards to restrict the conduct of majority shareholders who propose to make a fundamental change, the provisions in this Part confer upon a shareholder who dissents from the fundamental change the privilege of opting out of the corporation and demanding fair compensation for his shares. **In short, if the majority seeks to change fundamentally the nature of the business in which the shareholder invested**, and if the shareholder dissents from the change, he may demand that the corporation pay him the fair value of his shares as determined by an outside appraiser….Instead of placing the minority shareholder at the mercy of the majority, these provisions permit the minority shareholder to **withdraw from the enterprise** and, if enough minority shareholders are affected, to bar the proposed change…**The result is a resolution of the problem***

12

*that protects minority shareholders from discrimination and at the same time preserves flexibility within the enterprise, permitting it to adapt to changing business conditions".* (emphasis added).

37. Secondly, the Company relies upon the "*Report on Proposals for a New Alberta Business Corporations Act*" (Institute of Law Research and Reform, Alberta, 1980), Vol. 1 ("**the Alberta Law Commission Report**") at pages 128-129:

> "*The jurisdictions which have adopted the appraisal right recognize the right of the majority to have their way ... However, if the majority want to change the broad ground rules, the minority, though unable to prevent the change, are entitled in those jurisdictions to demand that the company buy them out at fair value: the majority can do what it wants but it **cannot hold the minority captive in an undertaking fundamentally different from that which everyone originally contemplated, or in a position within the company fundamentally different from that which the minority purchased**.*
>
> *The existence of the appraisal right gives rise to many difficulties. **It is intended to give a bona fide minority a weapon against an unfair or unprincipled majority**, but it may instead give an unfair or unprincipled minority an opportunity to extort benefits from the majority. An unquantified potential liability to buy out minority shareholders may inhibit bona fide corporate action. Buying out the minority may bleed the company of cash needed for its ordinary affairs or for the carrying out of the proposal which triggers the appraisal right. The proceedings to enforce the appraisal right are likely to be complex, long-drawn out and expensive. Nevertheless, we think that fairness to the minority requires that the appraisal right be instituted, and we recommend accordingly. There should be some limit beyond which majorities cannot carry minorities, and the mere existence of the appraisal right should usually cause the majority and the minority to reach a settlement.*"

38. Thirdly, the Company relies upon the New Zealand Law Commission's Report on "*Company Law Reform and Restatement*" (1989) at pages 49-50:

> "*[The buy-out procedure] is designed to ensure that **in the case of fundamental change to the nature of the enterprise** and to the class rights enjoyed by the shareholder, **a dissenting minority shareholder does not inevitably have to accept the majority decision. The shareholder will instead have the option of leaving the company** …*
>
> *The buy-out provision recognises not only that **there is a level of change to which it is unreasonable to require shareholders to submit** but also that in many cases the presence of a disgruntled shareholder will be of little benefit to the company itself.*"

39. The Company also relies upon statements made in the authorities as to the purpose of the appraisal remedy. The Company relies upon *Grandison v NovaGold Resources Inc* 2007 BCSC 1780 at [150], where the Supreme Court of British Columbia quoted the following extract (from *Krishna, Determining the "Fair Value" of Corporate Shares*) with approval:

> "*The core of the structure for the protection of minority shareholders is their statutory right to the "fair value" of their shares in circumstances when they are rendered vulnerable by the actions of the majority. Whether in appraisal, oppression, take-over, merger, or going-private proceedings, it is the shareholder's right to exit from the corporation with the fair value of shares that affords the dissenter the ultimate, sometimes only, protection from the acts of the majority.*"

40. Finally, the Company relies upon the judgment of Wallbank J in *Nettar Group Inc v Hannover Holdings SA* (British Virgin Islands BVIHCM 2021/0177) at [135] to [141]:

"*[135] But let us suppose that the minority shareholder duly objects and gives notice of his election to dissent from a merger, but then goes into the market and buys other shares in the company from another member. He is free to do so. The legislature could have prohibited him from doing so, but it did not. Can it really be said that the intention of the legislature was that the new owner of these shares should be able to invoke the fair-value buy back mechanism? I am persuaded that the answer is 'no'.*

*[136] There is a clear legislative intent behind section 179 to give a minority shareholder an opportunity to relinquish its shareholding in exchange for fair value if he does not want to consent to a merger. The purpose is obvious: so that a minority shareholder who does not want to consent to a merger does not have to be locked into a company that has become fundamentally different from that which he invested in and then suffer a depreciation in the value of his shareholding as a result of such a merger. This is abundantly clear from the various Commonwealth legal writings on similar provisions elsewhere that Hannover itself relies upon. The legislature thus gave such minority shareholders a remedy for what, on one level, could be seen as an unfairness. Section 179 provides for a fair way out.*

*[137] **On the other hand, it is difficult to see why a shareholder should be provided with an exit – and compensation - mechanism if he deliberately acquires more shares in the company after he is informed it is going to be subject to a merger and after he has given notice that he objects to or dissents from it. Acquiring more shares is his free choice and indeed right; but choices have consequences, and it is not the task of the legislature to save an investor from them. There is not even a penumbra of unfairness about it. As the adage goes, 'you make your bed, you lie in it'.***

15

*[138] I detect no legislative intent to avail such an investor of the exit mechanism intended for a different category of persons, namely members who were minority shareholders before a merger has been decided upon and confirmation thereof has formally been communicated to them.*

*[139] Indeed, the legislative intent appears to be to allow a member to give up his membership and receive full fair value for his shareholding without any detrimental effect which a decision to merge may have upon the value of his shareholding. In other words, the legislative intent is to permit a member then to have a no-loss exit, if that is what he wants.*

*[140] The words of section 179 stand to be construed against this intention.*

*[141] **The exit mechanism is not intended to assist persons who decide to buy shares in the company after a decision to enter into a merger has been made known**."* (emphasis added).

### The Dissenting Shareholders' case on the meaning of section 106

41. A summary of the case of the Dissenting Shareholders on the meaning of section 106 is set out at [8] above. The Dissenting Shareholders submit that section 106(6) is clear. It permits any shareholder who did not vote in favour of the amalgamation and who is not satisfied that it has been offered fair value for its shares to apply to the Court to appraise the fair value of its shares. The Plaintiffs are all shareholders who did not vote in favour of the amalgamation and who are not satisfied that they have been offered fair value for their shares. They therefore fall within section 106(6) as having the right to apply to the Court to appraise the fair value of their shares.

42. The Dissenting Shareholders contend that there is nothing in section 106(6) which restricts its application to shareholders who acquired their shares before the notice of special general meeting was issued. Such a restriction (i) would require reading words into the statute, (ii) depends on an unrealistic and unprincipled approach to identifying which shareholders can be said to have "received" the Notice for which there is no support in the statute or common sense, (iii) is inconsistent with the legislative history of s. 106(6) and (iv) would produce remarkable and capricious results that the legislature is most unlikely to have intended.

43. The Dissenting Shareholders say that the purpose of the appraisal right in section 106(6) (and in section 103) is to allow the majority to proceed with a transaction that they consider beneficial and acquire or cancel the shares of the dissenting minority without their consent. It is a "neutral" right in the sense that it does not depend on anyone having acted wrongfully or oppressively: the obligation to pay fair value is simply the *quid pro quo* for the majority's right to cancel the shares of the dissenting shareholders. It prevents the minority from blocking a transaction and equally prevents the company from acquiring or cancelling shares at an undervalue. Since the sum that the company is required to pay is simply the "fair value" of the shares, neither the company nor the shareholder obtains any windfall: the shareholder deprived of his shares simply receives what they were properly worth.

*Discussion on the meaning of section 106*

44. Counsel for both parties referred to principles of statutory interpretation which are potentially relevant to the interpretation of section 106 of the Act. The relevant "principles" are uncontroversial and are as follows:

(1) "*The sole object of statutory interpretation is to arrive at the legislative intention …. In construing that intention I have regard to the language of the section, its statutory context, and broader policy considerations*". Per Hellman J in in *MFP-2000, LP v Viking Capital Limited* [2014] Bda LR 6, at [32].

(2) The primary indication of legislative intention is the legislative text, read in context and having regard to its purpose. The modern approach to statutory interpretation is to have regard to the purpose of a particular provision and interpret its language, so far as possible, in a way which best gives effect to that purpose: *Barclays Mercantile Finance Ltd v Mawson* [2004] UKHL 51, at [28]. As Lord Bingham explained in *R (Quintavalle) v Secretary of State for Health* [2003] UKHL 13, at [8]:

> "*The basic task of the court is to ascertain and give effect to the true meaning of what Parliament has said in the enactment to be construed. But that is not to say that attention should be confined and a literal interpretation given to the particular provisions which give rise to difficulty …. Every statute other than a pure consolidating statute is, after all, enacted to make some change, or address some problem, or remove some blemish, or effect some improvement in the national life. The court's task, within the permissible bounds of interpretation, is to give effect to Parliament's purpose. So the controversial provisions should be read in the context of the statute as a whole, and the statute as a whole should be read in the historical context of the situation which led to its enactment*."

(3) A statute should be read as a whole, so that one of its provisions *"is not treated as standing alone but is interpreted in its context as part of the instrument*" (Bennion on Statutory Interpretation (8th edn) ("**Bennion**"), [21.1]). Accordingly, the court's task is to "*identify the meaning borne by the words in question in the particular context*." The court will "*ascertain the intention of Parliament expressed in the language under consideration*." This is an objective, rather than a subjective, exercise (*R v Environment Secretary, Ex p Spath Home Ltd* [2001] 2 AC 349, at 396 (Lord Nicholls)).

(4) When identifying the intention of Parliament, the court will assume Parliament "*to be a rational and informed body pursuing the identifiable purposes of the legislation it enacts in a coherent and principled manner*" (*R (N) v Walsall Metropolitan Borough Council* [2014] PTSR 1356, [65] (Leggatt J)).

(5) The court will take into account the state of the previous law and its evolution (Bennion [24.5]).

(6) The court will seek to avoid a construction that produces unreasonable or absurd results, and "*[t]he more unreasonable a result, the less likely it is that Parliament intended it*" (Bennion [26.3]; *Regina v Central Valuation Officer and Another* [2003] UKHL 20, [117] (Lord Millett)).

(7) Where a statute permits the expropriation of property, it should be construed strictly in favour of the party whose property is to be expropriated (Bennion [27.6]; S *Franses Ltd v Cavendish Hotel (London) Ltd* [2018] 3 WLR 1952, [16] (Lord Sumption); *Re Changyou.com Limited*, FSD 120 of 2020 (28 January 2021) (Smellie CJ), [52] - [54]).

45. Having regard to the principles of construction the Court proposes to consider (i) whether the object of section 106(6) necessarily leads to the conclusion that the Short Term Shareholders are excluded from the appraisal right/remedy set out in that subsection; (ii) whether, as a matter of construction of section 106(6), the Short Term Shareholders come within the scope of section 106(6); (iii) whether the construction of section 106(6) is consistent with the legislative history of section 106; (iv) whether the Company's construction is consistent with its own case as to the categories of shareholders who are entitled to exercise appraisal rights under section 106(6); and (v) the consequences of the Company's construction of section 106(6).

*(i)*  ***The object of section 106(6)***

46. Relying upon the Dickerson Report and the Alberta Law Commission Report, the Company argues that the object of section 106(6) is to facilitate a minority shareholder to withdraw from the enterprise in circumstances where the majority seeks to change fundamentally the nature of the business in which the shareholder invested. From this premise the Company argues that the Short Term Shareholders, who acquired shares in the Company after the notice is given with the knowledge of the proposed amalgamation, must necessarily be excluded from the scope of section 106(6). The Company argues in no sense can it be said that the shares are taken against their will, or expropriated, or that they will suffer a fundamental change to the nature of the business in which they invested.

47. However, the Company's argument that shareholders who deliberately "buy into" the dissent and appraisal remedy should not be entitled to exercise it, has been consistently rejected by the Canadian courts. Thus, in *Silber v Pointer Exploration Corp.* (1998) 64 Alta. L. R. (3d) 134, the Alberta Court of Queen's Bench, was faced with such an argument in relation to appraisal rights under section 184 of the Business Corporations Act (Alberta) RSA 1981. Moore CJ rejected this submission at [32] to [35]:

> *"32.* ***Pointer states that the applicants "bought in" to the remedy, as they admit knowing of the proposed Arrangement at the time they purchased the bulk of their shares. Pointer cites various authorities which state that the purpose of dissent rights is to enable minority shareholders to escape from something fundamentally different than that which they originally envisioned and signed up for****. For example, see the Institute of Law Research and Reform, The University of Alberta, <u>Draft Report No.2 - Proposals for a New Business Corporations Law for Alberta</u> (January 1980) at 126; and <u>Bradley Resources Corp. v Kelvin Energy Ltd</u> (1985), 39 Alta. L.R. (2d) 193 (Alta. C.A.) at 196.*
>
> *33. However, the Institute's report concluded that the dissent and appraisal remedy should be adopted, despite any potential for a minority to extort benefits from the*

*majority (at 126 – 127).* ***Because of this, and for practical reasons, the appellants submits that motives are irrelevant. It would be impractical and unworkable for the court to enquire into every dissenting shareholder's state of mind. Moreover, shareholders are entitled to be motivated by the chance of making a profit.***

*…*

*35.* ***I agree with the applicants that motive is not relevant to the exercise of dissent and appraisal rights. Assessing intentions is not relevant, not possible, and not the court's function. Dissent rights are exercised (through notice and by abstaining from voting) at the date the controversial action is adopted; fair value is determined at the close of business the day before the controversial action is adopted; the entitlement to dissent should also be effective at the date of the controversial action.*** *"* (emphasis added).

48. The same argument was presented to the Ontario Court (General Division) in *Silber v BGR Precious Metals Inc* (1998) 41 O. R. (3d) 147. In rejecting the argument Ferrier J held at 155b:

*"Before applying the foregoing principles to the evidence in this matter, it is best to dispose of the question of the ability of Shoom and Silber to bring the action.* ***The suggestion was made, although not pursued particularly enthusiastically on the application, that as Shoom and Silber bought the shares after the announcement (and their awareness) of the fundamental change, they should not be entitled to dissent from the special resolution, and therefore should not be able to bring a fair value application. I disagree. All shareholders in a situation like this have a right of dissent, regardless of the time of purchase*** *…*

*Similarly, in* <u>*Palmer v Carling O'Keefe Breweries of Canada Ltd*</u> *(1989), 67 O.R. (2d) 161, 56 D.L.R. (4*[th]*) 128 (Div. Ct.) Southey J. observed at pp. 169-70:*

> *I am unimpressed with the argument that no relief should be given in*
> *respect of shares purchased after the intention to amalgamate became*
> *known. In respect of those shares, the purchasers "bought into the*
> *oppression". If relief is given to anyone in these proceedings, it will mean*
> *that the applicant correctly appreciated the legal rights of the preference*
> *shareholders. If the applicant and others could not take advantage of those*
> *rights with respect to the shares they were bold enough to purchase while*
> *those rights were still in dispute, it would mean that less sanguine owners*
> *would be deprived of the advantage of selling their shares during the*
> *pending litigation at prices reflecting the purchasers' estimate of the*
> *chances of success. Any such rule would place a new, and in my view,*
> *unwarranted restriction on the price of shares that are traded on the stock*
> *exchange.*
>
> *The conduct of the applicant and those associated in the same interest will*
> *either turn out to have provided an effective check on unlawful acts by the*
> *directors, or it will prove to have been a very expensive exercise in tilting*
> *at windmills. The owners of small number of shares probably could not*
> *afford to run the risks involved in providing such check."* (emphasis added).

49. Again, the Alberta Court of Appeal held in *Brookdale International Partners LP v Legacy Oil & Gas Inc.* [2018] A. J. No. 728 that it was an error in principle to treat shareholders differently because they bought shares immediately before the plan of arrangement was announced and immediately thereafter but before the plan of arrangement was closed. The Alberta Court of Appeal's reasoning in relation to this issue is set out at [22] to [29] of the judgment:

> *"22 The reasons state of the appellants: "They are sophisticated investors. They*
> *knew what they were doing" (reasons, para. 89). It is conceded that the appellants*
> *have a right to dissent, a right to be paid "fair value" for their shares, and a right*
> *to request an advance payment. There is no principled basis for criticizing them for*
> *exercising their admitted rights, granted to them under the Plan of Arrangement.*

*The appellants may have chosen to dissent, but the other side of that choice was the right to the statutory remedies.*

*23 The respondents also criticize the appellants because they bought Legacy shares immediately before, and shortly after the Plan of Arrangement was announced. The respondents argue that the appellants are not the type of "long term investors" that the ABCA is designed to protect.*

*24 Stock exchanges play a very important role in the economy. They allow the pooling of capital by numerous investors. That gives businesses a source of capital, while maintaining management and control of the enterprise in dedicated officers and directors. Investors who do not wish to engage actively in business can invest their money in larger enterprises, and can spread their money among numerous companies and industries: Nicholls, C.C., Corporate Finance and Canadian Law, (Toronto: Thomson/Carswell, 2000) at pp. 275-7; Gillen, M. R., Securities Regulation in Canada, (3rd ed.) (Toronto: Thomson/Carswell, 2007) at pp. 33-5.*

*25 A big advantage of open public stock markets is that they provide liquidity; investors can buy and sell shares easily and frequently. The free trading of shares also sets a price that represents "market value", which price can quickly adjust to changing risks, performance and future prospects of the issuer, or anticipated transactions affecting the issuer.*

*26 In order to promote their objectives of capital accumulation and liquidity, stock markets permit many forms of investment, although in a highly regulated environment. Not only may investors buy shares in an issuer, they can also buy options or derivatives, engage in short selling, and enter and leave the market at will. Investors make their own decisions on the merits of investments, and are entitled to buy securities they think will increase in value, for whatever reason. So long as the investors follow the rules of the TSX and the applicable Securities Act, any form of transaction is presumptively legitimate.*

27 *Another feature of stock markets is their universality and anonymity. Anyone can (through registered brokers or advisors) purchase shares listed on the stock exchange. Unless certain regulated thresholds are met (for example, for insiders), investors do not have to disclose or explain their trades. Investors do not have to be resident or citizens of the jurisdiction where the exchange is based.*

28 **It follows that it was an error of principle to treat the appellants differently because they bought shares immediately before the Plan of Arrangement was announced, and immediately thereafter but before the Plan of Arrangement closed: <u>Silber v BGR Precious Metals Inc.</u> (1998), 41 OR (3d) 147 at p. 155, affirmed (2000), 46 OR (3d) 255 (CA). Investing in anticipation of future events, or in anticipation of the effects of announced changes in the issuer, is a legitimate form of investment. Further, there are not different levels of rights to dissent, because the ABCA does not distinguish between different classes of investors like "long term", "sophisticated" or "foreign hedge funds". All are bound by the ABCA, and entitled to the remedies set out in it.**

29 *In <u>Deer Creek Energy Limited v Paulson & Co. Inc.</u>, 2008 ABQB 585 the "Paulson" investors had entered the market in anticipation of corporate changes, and ended up being dissenting shareholders. The trial judge held at para. 3:*

> *... Paulson described itself through its president at the hearing as being in the business of "event arbitrage", meaning that Paulson would speculate on the potential that a "corporate event" like a takeover bid would produce value. I found that the testimony of Paulson's principal witness to the effect that Total's second-stage transaction was a surprise and that Paulson hoped to be able to continue as a minority shareholder in a Total-controlled Deer Creek was not credible and that Paulson had no reasonable expectation of remaining a long-term shareholder when it acquired its shares. I agree with the Deer Creek submission that the Paulson purchase of shares was in effect a purchase of a fair value claim. **While that***

24

> *does not affect the fair value of the shares or disentitle Paulson from its right to dissent or to pursue fair value, the fact that Paulson is not the type of long-term shareholder forced out by a corporate change that the legislation envisaged in enacting dissenting shareholder provisions is a factor in the determination of whether there are special circumstances that justify an award of costs.*

> **This finding was reversed on appeal in *Deer Creek Energy Ltd. v Paulson & Co. Inc.*, 2009 ABCA 280 at para. 20, 460 AR 180:**

> > *... we discern no legislative intent to distinguish between types of shareholders. It is the ability of investors like Paulson to move freely in and out of the market, and so set the price, that gives the market value approach part of its validity. We also consider the manner in which the appellants acquired their shares to be entirely in keeping with the provisions governing the rights of a dissenting shareholder...*

> > *Buying securities in anticipation of a Plan of Arrangement, and other examples of so called "event arbitrage", are an important and legitimate use of the stock exchange. Transactions of this sort promote liquidity and the constant re-setting of the market price."* (emphasis added).

50. The argument advanced by the Company to this Court was presented to the Supreme Court of British Columbia in *689531 B.C. Ltd. v. Anthem Works Ltd*., 2009 BCSC 657. In that case on March 23, 2004, Anthem Works Ltd ("**Anthem**") announced a plan to "go private" by way of an Arrangement whereby the defendant, Anthem Acquisition Ltd., was to purchase its shares at $14.50 per share (the "**Arrangement**").  The plaintiffs purchased approximately 264,000 shares in Anthem. Almost all of those shares were purchased after March 23, 2004, as the shares continued to trade until at least May 13, 2004. Some of those shares were apparently purchased at prices above $14.50 per share. The plaintiffs purchased the shares so that they could dissent to the privatization of the company in order

to obtain a price higher than $14.50 for their shares. Hinkson J held that what the plaintiff did was not improper, or contrary to public policy or statutory intent:

> *"[22] While Mr. Shapray argued that the plaintiffs were guilty of what he referred to as either "greenmail", a pejorative term he said captured those who stir up litigation in order to profit from it, or a "shakedown", he conceded that the plaintiffs did nothing illegal.* **Mr. Shapray elaborated by arguing that the plaintiffs' conduct was contrary to public policy or statutory intent.**
>
> *[23]* **I am unable to see that what the plaintiffs did was improper or contrary to either public policy or statutory intent.** *The public policy that Mr. Shapray said was offended, was, he said, embodied in the tort of maintenance. He argued that what the plaintiffs did was to engage in mutual support to stir up litigation.*
>
> *...*
>
> *[26]* **As far as statutory intent is concerned, the CBCA [Canada Business Corporations Act] provides for precisely the actions which the plaintiffs took. They speculated on the value of Anthem's shares, and purchased at least some of their shares at prices in excess of what Anthem was offering to its shareholders. They were then able to recover more for their shares than they paid for them. That is what most who invest in securities hope to accomplish.***"* (emphasis added).

51. The Court accepts Mr Howard QC's submission, on behalf of the Dissenting Shareholders, that the Canadian courts have categorically rejected the suggestion that the corollary of the Alberta Law Commission's Report is that the appraisal arbitrageurs should not be entitled to exercise appraisal rights. It is clear to the Court that the Canadian courts have rejected the submission, based on legislative material from Canada, that post-notice shareholders are not entitled to exercise appraisal rights.

52. It further appears that the similar arguments that appraisal arbitrageurs should not be entitled to exercise appraisal rights have been rejected in Delaware. In *Salomon Bros. v*

*Interstate Bakeries Corporation* ("IBC") 576 A.2d 650 (Del. Ch. 1989), IBC argued that the appraisal statute was not designed to protect those who wish to speculate on a judicial remedy and that Salomon acted in bad faith by purchasing shares with notice of the merger and then demanding appraisal. Alternatively, IBC argues that Salomon is estopped from demanding appraisal. Berger V-C of the Court of Chancery of Delaware held that Salomon had not forfeited this statutory right, at p. 652:

> "*...The ability of a dissenting stockholder to prevent a merger led to the enactment of statutes permitting fundamental corporate change upon some form of majority vote, see <u>Schenley Indus. v. Curtis</u>, Del.Supr., 152 A.2d 300, 301 (1959), and appraisal rights were provided as a " quid pro quo for the minority's loss of its veto power." <u>In re Shore,</u> 67 A.D.2d 526, 415 N.Y.S.2d 878, 882 (1979).*
>
> ***This history of our appraisal statute does not support IBC's argument that the statute was designed to protect only those stockholders who purchased their shares prior to the announcement of a merger***. *Rather, its purpose was to replace the stockholder's veto power with a means of withdrawing from the company at a judicially determined price. None of the Delaware cases cited by IBC suggests otherwise*."

53. Berger V-C in *Salomon Bros.* noted that several New York courts had "*denied appraisal rights to dissenting stockholders on facts similar to those presented here. In <u>Application of Stern</u>, N.Y.Supr., 82 N.Y.S.2d 78, 82 (1948), the court found that stockholders who had bought shares "in spite of" a plan of merger were faced with "a choice of their own selection" and therefore were not entitled to appraisal*." However, Berger V-C declined to follow the reasoning of the New York courts, at pp. 652-653:

> "*I am not persuaded by the <u>Stern</u> ruling. If appraisal rights were granted as the <u>quid pro quo</u> for the loss of veto power, there is no apparent reason why all stockholders who formerly could have exercised that veto power should not now be able to exercise appraisal rights. **The common law veto power was exercisable without reference to the stockholder's motives and it seems reasonable to assume***

27

*that appraisal rights, likewise, are not determined by reference to a stockholder's purpose."* (emphasis added).

54. In *re Appraisal of Dell Inc*., Consol. C.A. No. 9322-VCL, (13 July 2015) Delaware Court of Chancery again confirmed that a shareholder continues to be entitled to his appraisal right for shares acquired after the record date. The Court considered that an appraisal claim is simply a chose an action which passes with the shares. Laster V-C held at pages 48-49:

> "*In my view, the rise of appraisal arbitrage suggests the need for a more realistic assessment of the depository system that looks through Cede to the DTC participants. But first, a caveat: Looking through DTC would not eliminate the ability of appraisal petitioners to seek appraisal for shares acquired after the record date, which is an outcome that opponents of appraisal arbitrage frequently advocate. As to that possibility,* **it is not clear to me why the law should treat a stockholder's right to seek an appraisal differently than how it treats other legal rights. An appraisal claim is simply a chose in action. As such, the claim passes with the shares. In a market economy, the ability to transfer property, including intangible property, is generally thought to be a good thing; it allows the property to flow to the highest-valuing holder, thereby increasing societal wealth**. *For creditors, the ability to sell a bundle of property rights that the buyer can enforce is unquestioned. When a creditor assigns a loan, even one in default, the right to enforce the loan passes to the new holder. No one objects that the assignee purchased a lawsuit. It is not apparent to me why a right held by the equity side of the capital structure should be treated differently, particularly when the right to bring an appraisal proceeding has been compared by the Delaware Supreme Court to a debt collection action.*" (emphasis added).

55. The Cayman courts seem to have adopted the same approach as the approach adopted by the courts in Canada and Delaware. In *Re Integra Group* [2016 (1) CILR 192], Jones J held at [16]:

> *"16 Mr. Imrie referred me to an article published in the Canadian Annual Review of Civil Litigation, 25, at 9–31 (2011) entitled "Fair Value"—A Common Issue with Surprisingly Sparse Canadian Authority by Clarke Hunter, Q.C. and Clarissa Pearce which I found to be helpful in a number of respects. On the question of what is meant by "fair value" in the Canadian legislation, which is very similar to s.238 (see the Canada Business Corporations Act 1985, s.190), the authors make the following general propositions as being well established by the authorities:*
>
> *...*
>
> *8**. The characteristics and motivations of the dissenting shareholder are generally irrelevant to a fair value determination, even when the dissenters are engaged in arbitrage**."* (emphasis added).

56. The position set out in *Re Integra Group* was confirmed by Parker J in *EHI Car Services Limited* FSD 115 of 2019 (Grand Court of the Cayman Islands) (24 February 2020) at [64]:

> *"It is important to bear in mind that the characteristics of, and the motivations which might be guiding, dissenting shareholders are generally irrelevant to a fair value determination: see <u>Integra</u> at § 16 (8), <u>Zhaopin</u> at § 48-50 and <u>Qunar</u> at § 63. So is the timing and amount of their investment and whether they bought after the merger announcement with full knowledge of it and before the EGM or whether they voted for the merger or not. **It is not relevant to ascertain whether they are speculative investors engaged in arbitrage or long-term shareholders who are being 'taken out' by the majority against their will, as fair value needs to be determined in one way for all dissenting shareholders irrespective of whether or not they might be said to be more or less 'deserving'**: see <u>Qunar</u> at § 63."* (emphasis added*).*

57. The above review of the authorities establishes that the courts of Canada, Delaware and the Cayman Islands have consistently held that the fact a dissenting shareholder acquired the

shares after the notice of the meeting to approve the amalgamation or merger is not a relevant consideration to his entitlement to the appraisal right/remedy. In particular the Canadian authorities establish that the policy rationale underpinning the appraisal right afforded to the minority shareholders, set out in the Dickerson Report and the Alberta Law Commission Report, does not lead to the conclusion that the appraisal arbitrageurs should not be entitled to exercise appraisal rights. The contrary submission made to this Court by Mr Crow QC, on behalf of the Company, has been consistently rejected by the courts in Canada.

58. The only decision which indicates a contrary approach is the decision of Wallbank J in *Netter Group Inc v Hannover Holdings SA*, Eastern Caribbean Supreme Court, British Virgin Islands, 15 December 2021. Mr Howard QC points out that the BVI law governing appraisal rights is based on Canadian law, and Canadian courts have repeatedly made clear that the motives and timing of the shareholder's investment are irrelevant to appraisal jurisdiction. It does appear from the judgment that Wallbank J was not referred to any of the significant Canadian authorities reviewed above.

59. To the extent that the Court is required to take into account the purpose of section 106(6), the Court prefers the approach of the courts in Canada, Delaware and the Cayman Islands and holds that it does not necessarily lead to the conclusion that the right to seek appraisal is limited to those who held shares prior to the date of the notice of the meeting to approve the amalgamation or the merger.

*(ii)  Language of section 106*

60. Section 106(6) provides that:

> "*Any shareholder who did not vote in favour of the amalgamation or merger and who is not satisfied that he has been offered fair value for his shares may within*

*one month of the giving of the notice referred to in subsection (2) apply to the Court to appraise the fair value of his shares*."

61. Mr Crow QC, for the Company, submits that the critical question for purposes of this application is what is meant by the expression "*not satisfied that he has been offered fair value for his shares*." He says the only offer of fair value within the statutory regime is the statement of fair value under section 106(2). He argues that if a shareholder is not satisfied that the notice under section 106(2)(b) states a fair value with which he is satisfied, then the requirement of section 106(6) is satisfied.

62. Mr Crow QC submits that the statement of fair value under section 106(2)(b) is critical to the understanding of how this statutory regime works. The statement of fair value must go into the notice under section 106(2) which goes to the shareholders of the company. The statement of fair value in the notice, according to this argument, is the "offer" made by the Company to its shareholders. If any shareholder is not satisfied with this "offer" he may exercise his rights under subsection (6) and seek appraisal of fair value by the Court.

63. The corollary, Mr Crow QC argues, is that the offer is simply not made because the notice is not addressed to anyone who is not a registered shareholder or beneficial owner when the notice was given. He says that those shareholders who acquire the shares after the notice has been given under section 106(2) cannot exercise any rights under section 106(6) since they were not the recipients of any notice under section 106(2) and have received no "offer" of fair value from the Company.

64. The Court accepts the position of the Dissenting Shareholders that the reference to the shareholder being offered fair value for his shares is a reference to the terms that are set out in the proposal that is or is to be voted on and passed at the meeting of the shareholders of the company. If a shareholder is not satisfied with those terms and did not vote to approve them, he can ask the court to appraise the fair value of the shares. There is nothing in section 106(6) to suggest that the "offer" to shareholders being referred to is a technical

concept, tied or restricted to any particular document or step. It is immaterial whether the "offer" of fair value is made in the amalgamation agreement, the notice under section 106(2) or the proposed resolution to approve the agreement or in combination of all the above. The Court accepts the submission that by tying and restricting the offer to a particular document at a particular time, the Company, for its own purposes, is seeking to introduce a limitation that is not present in section 106(6) and for which there is no good reason. There is nothing in section 106(6) or elsewhere that suggests that the only potential source of the relevant offer is the notice under section 106(2).

65. The Court accepts the Dissenting Shareholders' submission that there is, in fact, nothing in section 106(6) that suggests that the '"offer"' refers to the notice given in accordance with s.106(2) at all. It is not readily apparent why the reference to an "offer" in s.106(6) should be tied or limited to what is said in that notice. The Notice merely states that "*for the purposes of section 106(2)(b) … the fair value of the shares has been determined by* [the Company] *as US$33.00 per share, and a dissenting shareholder is entitled to be paid fair value of their shares*."  It is to be noted that a statement was included at p.3 of the circular that contained the Notice that said in terms that "*this document is not intended to and does not constitute, or form part of, an offer*…"

66. The Court accepts Mr Howard QC's submission that to the extent that the Company was making an "offer" in the Notice, there is no reason to regard it as one that was limited in its effect to those who received the Notice. It was, in fact, a general "offer" whose terms applied to all those whose shares were to be acquired or cancelled as part of the proposed amalgamation, whether they ever received the Notice or not. The Company's case involves the assertion that no "offer" was ever made to those shareholders who acquire the shares after the Notice ("**Post-Notice Shareholders**") despite the fact that, amongst other things, (i) the terms being "offered" applied to their shares; (ii) they were entitled to attend and vote at the special general meeting on the question of whether or not the amalgamation agreement should be approved (and the "offer" thereby "accepted") and (iii) they have in fact been paid the US$33 per share that was being "offered" for their shares. The Court accepts that is not a realistic assertion.

67. In relation to the general "offer" it is to be noted that the Notice was not in fact formally "addressed" to anyone in particular.  It was sent to registered shareholders and published by the Company on its website and on the London, Singapore and Bermuda Stock Exchange websites. It was thus made available to be read by any actual or prospective shareholder, including the Post-Notice Shareholders.

68. The Court accepts that there is no legal, linguistic or logical reason why the Company should not be regarded as having given (or "addressed") the Notice to a Post-Notice Shareholder (and equally no reason why such a person should not be said to have "received" the Notice). The Notice appears to be (and was) a general notice that one would expect to be read by and apply to any shareholder in the company, including the Post-Notice Shareholders when they acquired their shares. Consistently with that, it is common ground that those who became shareholders after the Notice was issued were entitled to attend and vote at the meeting to which it referred, that the "fair value" set out in it was intended to apply to their shares and that their shares would be subject to compulsory cancellation if the resolution approving the amalgamation agreement was passed at the meeting. In those circumstances, the Court accepts, it is unrealistic to assert that the Notice was not "addressed" or given to such shareholders in any meaningful sense.

69. Accordingly, the Court does not accept the interpretation of section 106(6) contended for by the Company. It requires the Court to read a limitation into s.106(6) that is not present in the statutory language, and which depends on assertions about the relevance of the "addressing" and "receipt" of the Notice that make no commercial sense. The Court accepts that section 106(6) simply provides that a shareholder may request an appraisal of the fair value of the shares of which he is being deprived by the amalgamation or merger if he is not satisfied that he has been offered fair value for them by the Company. All of the Plaintiffs, including the Short Term Shareholders, meet that description in this case.

*(iii)   The legislative history of section 106*

70. Section 106 was first enacted by Parliament in the Companies Act 1981. In 1981 the relevant provisions of section 106 provided that:

> *"(2) A notice of a meeting of shareholders complying with section 75 shall be sent in accordance with that section to each shareholder of each amalgamating company and shall –*
>
>> *(a) include or be accompanied by a copy or summary of the amalgamating agreement; and*
>>
>> *(b) state that a dissenting shareholder is entitled to be paid the fair value of his shares, but failure to make that statement does not invalidate an amalgamation.*
>>
>> *...*
>>
>> *(6) Any shareholder not satisfied that he has been paid fair value for his shares may apply to the Court for the proper valuation of his shares and section 103 shall apply <u>mutatis mutandis</u> to such application."*

71. It is common ground that section 106(6), as it existed in 1981, allowed all shareholders to bring a claim who had not been "paid" fair value for their shares. That would plainly include all the Plaintiffs in this case. The Short Term Shareholders contend that they have not been "paid" fair value for their shares.

72. The original section 106(6) was amended in 1994 by the Companies Amendment Act 1994. The reason for the amendment was set out in the Explanatory Memorandum to the amendment bill which stated that:

"Clause 16 of the Bill amends section 106 of the Act. Section 106 deals with the approval of shareholders in respect of an amalgamation. The main problem associated with section 106 arises in the context of dissenting shareholders. **The section suggests that a dissenting shareholder can only apply to the Court for a proper valuation of his shares after the completion of the amalgamation. Thus amalgamating companies cannot determine the liability due to dissenting shareholders before completion of the amalgamation. The amendments effected to section 106 are intended to overcome this hurdle.**" (Emphasis added).

73. The original section 106 was amended in three respects. First, by the insertion in section 106(2)(b)(i) of the requirement that the notice of meeting of shareholders shall state "*the fair value of the shares as determined by each amalgamating or merging company.*" This introduced a requirement that the company state the fair value of the shares in cash terms. Second, section 106(6) was amended by providing that any shareholder who was not satisfied that he has been "*offered*" fair value of his shares may "*within one month of the giving of the notice referred to in subsection (2)*" apply to the court to appraise the fair value of his shares. Third, section 106(6C) introduced the new provision that no appeal shall lie from appraisal by the Supreme Court under section 106(6).

74. The Court accepts Mr Howard QC's submission that it is thus clear that the purpose of the reference to an "offer" in s.106(6) was not to introduce a requirement for the bringing of a claim or to limit the class of shareholder that can exercise the appraisal right – it was simply to make it possible for shareholders to exercise that right prior to the amalgamation being completed and the price being "paid" so as to enable the amalgamating companies (if they so wished) to determine the liability to dissenting shareholders before the amalgamation completed.

75. Having regard to the particular issue which Parliament was addressing in 1994, it is clear that the word "offer" is not in fact being used in the sense of offer and acceptance. The word "offer" is being used to refer to what the company is proposing to pay. It is highly

unlikely that the 1994 amendment inadvertently created a technical bar that prevents post-notice shareholders from having appraisal rights.

76. When identifying the intention of Parliament, the Court will assume that Parliament is a rational and informed body pursuing the identifiable purposes of the legislation in a coherent and principled manner. In *Regina (N) v Walsall Metropolitan Borough Council* [2014] EWHC 1918 (Admin), Leggatt J, as he then was, stated the relevant principle at [65] as follows:

> "…*When courts identify the intention of Parliament, they do so assuming Parliament to be a rational and informed body pursuing the identifiable purposes of the legislation it enacts in a coherent and principled manner. That assumption shows appropriate respect for Parliament, enables Parliament most effectively to achieve its purposes and promotes the integrity of the law. In essence, the courts interpret the language of a statute or statutory instrument as having the meaning which best explains why a rational and informed legislature would have acted as Parliament has. Attributing to Parliament an error or oversight is therefore an interpretation to be adopted only as a last resort*."

77. The Court accepts the submission that in this case the Company has not put forward any coherent reason as to why Parliament in 1994, when it was concerned with ensuring that appraisal actions should be commenced at an early stage in order to allow companies to know where they stand, could have intended to create a new technical bar that prevents all post-notice shareholders from exercising the appraisal right at all. Accordingly, the Court concludes that the interpretation of section 106(6) advanced by the Company is inconsistent with the legislative history of section 106.

*(iv) Beneficial ownership of shares and the Company's construction of section 106(6)*

78. It is a notorious fact that shares in companies incorporated in jurisdictions engaged in international business, such as Bermuda, are commonly held through nominee shareholders. The shares are commonly registered in the name of a nominee company.

79. The Company's original position was that only the registered members of the Company to whom notice was sent in accordance with section 106(2) were entitled to seek an appraisal in this case. This position was set out in the letter from Appleby, the Company's Bermuda attorneys, dated 13 August 2021:

> *"5. The only persons entitled to seek an appraisal pursuant to section 106(6) of the Act are those to whom a Notice was sent in accordance with section 106(2) and who have, accordingly, been "offered fair value for [their] shares".*

> *6. **Accordingly, the only persons entitled to seek an appraisal in this case are those persons who were registered members of the Company on or before 17 March 2021 (the Long-Term Shareholders). Persons whose names appeared on the Company's register of members after 17 March 2021 (the Short-Term Shareholders) have no such entitlement under the Act**."* (emphasis added).

80. On 23 September 2021, the Company's position changed by expanding the class of shareholders who could seek an appraisal in this case. The Company now took the position that not only registered shareholders but also shareholders who held **a beneficial interest in the shares** or before 17 March 2021 could seek an appraisal in this case. This position is set out in the letter from Appleby dated 23 September 2021:

> *"The draft amended summonses seek to clarify the basis of the Strike Out Application, namely that the originating summonses of the Plaintiffs be struck out,*

37

*to the extent that the Plaintiffs seek relief as to shares in the First Defendant **in respect of which they held neither legal title nor a beneficial interest as at 17 March 2021**, on the grounds that such originating summonses disclose no reasonable cause of action or are otherwise an abuse of the process of the Court*." (emphasis added).

81. The Company's current position is reflected in the wording of the Amended Summons dated 30th of November 2021:

"*An Order…striking out the originating summons of the Plaintiff to the extent that the Plaintiff seeks relief as to shares in the First Defendant in respect of which it held **neither legal title nor a beneficial interest** as at 17 March 2021*" (emphasis added).

82. The Explanatory Statement sent by the Company to all shareholders of the Company explained how persons who held their shares through nominee arrangements could exercise their appraisal rights under section 106(6):

"*Shareholders should note that, if they do not hold their Jardine Strategic Shares in their own name, for example, if a nominee holds their Jardine Strategic Shares on their behalf, they are not entitled to exercise rights of dissent under section 106(6) of the Bermuda Companies Act directly. Any Shareholders who do not hold Jardine Strategic Shares in their own name, and who wish to pursue a dissent action under section 106(6) of the Bermuda Companies Act, should without delay make appropriate arrangements with the nominee who holds the legal title to their Jardine Strategic Shares to (a) not vote in favour of the Amalgamation Resolution at the Special General Meeting and (b) exercise any appraisal rights. **Alternatively, such Shareholder must make all arrangements necessary to have the relevant Jardine Strategic Shares registered in their own name in sufficient time prior to the Special General Meeting to exercise their appraisal rights themselves**.*" (emphasis added).

83. The Company has made no attempt to explain the inconsistency between its position as to the proper construction of section 106(6) and its position that persons holding a beneficial interest may nevertheless exercise appraisal rights under section 106(6). In the present application, the Company argues that only the recipients of the offer under section 106(2) who do not support the proposed transaction can exercise appraisal rights under section 106(6). It is the Company's case that only registered shareholders on the date of the Notice have the legal standing to commence an appraisal action under section 106(6). On that basis it is difficult to see how a person who merely holds a beneficial interest can have legal standing to commence an action under section 106(6) given that (i) such a person could not have received any Notice under section 106(2); and (ii) was not a registered shareholder on the date when the Notice was given under section 106(2).

### (v) *Consequences of the Company's construction of section 106(6)*

84. The construction advanced by the Company leads to surprising consequences and the Court is bound to ask whether Parliament intended such arbitrary and unjust results.

85. The Dissenting Shareholders make the fundamental point that the effect of the Company's approach is that it can forcibly acquire or cancel a shareholder's shares without paying fair value. Mr Howard QC argues that on the Company's case somebody who bought shares on 18 March 2021, one day after the Notice, would have no standing to seek fair value of the shares under section 106(6) and would have to accept whatever amount was offered by the Company. The result would be the same even if the Court considered that the fair value of the shares was twice the amount offered by the Company. It is difficult to accept that Parliament could properly have intended that just because a shareholder purchased the shares one day after the notice under section 106(2) was given, that shareholder is deprived of the right to receive the fair value of the shares and must accept the amount which has

been offered by the company even though the court has determined that the amount offered by the company was wrong.

86. Mr Howard QC submits that the Company's approach leads to the curious position that the right to request appraisal disappears into a legal black hole when shares are sold: it cannot be exercised by the person who held the shares when the notice was issued and cannot be exercised by the person who held the shares when they were taken by the Company. The Court accepts that it is unlikely that the legislature intended the right to appraisal to disappear in that way.

*Conclusion in relation to the meaning of section 106(6)*

87. For all the reasons set out above, the Court does not accept the position advanced by the Company that only Plaintiffs who were registered and/or beneficial shareholders as at 17 March 2021 can seek the relief under section 106(6). The Court holds that the right to request the Court to appraise fair value can be exercised by any shareholder who holds shares that are in fact taken from him by the Company as a result of an amalgamation or merger which he did not approve and provided that such an application is made within the time stipulated in section 106(6).

**D.  Ground 2: Abuse of process**

88. In relation to this ground, the Company relies upon the general proposition that the court will "*prevent the improper use of its machinery, and will in a proper case, summarily prevent its machinery from being used as a means of vexation and oppression in the process of litigation*": UK 1999 White Book para 18/19/18, cited with approval in *Krebs v Meritus Trust Company Limited* [2018] SC (Bda) 72 Civ, at [22].

89. The Company argues that in the sphere of company law, it is (for example) an abuse of process to use section 111 proceedings to achieve a collateral purpose: *Re Astec (BSR) plc* [1999] BCC 59, at 89E-90C. Similar principles apply in relation to transactions requiring the court's sanction: it is (for example) an abuse of process to seek the court's sanction of a reduction of capital to implement a pre-arranged commercial sale: *Re Rylands-Whitecross Limited*, unreported, 21 December 1973, at pages 6-7.

90. In this case, the Company contends, the Short Term Shareholders pursue these proceedings not in order to obtain relief from oppression as a result of the taking of shares against their will. Instead, their intention is to profit from the proceedings, having acquired their interests in the Company with knowledge that the Amalgamation would take place and for the sole purpose of commencing proceedings under section 106(6) of the Act. The Company contends that this is an improper use of the jurisdiction and remedy set out in section 106(6).

91. The Company relies upon the decision of Kawaley CJ in *Annuity & Life Reassurance Ltd v Kingboard Chemical Holdings Ltd* (10 November 2015)[2015] SC (Bda) 7 Com ("**Kingboard**") where the petitioner had commenced proceedings under section 111 of the Act and, after commencing those proceedings, had acquired more shares in the company with a view to increasing the gross price to be recovered if the court were to order the company to purchase the petitioner's shares at a fair price. Kawaley CJ considered that increasing the claim in that way ought to be an abuse of process:

> "*28. ... It was nevertheless impossible to ignore the strong instinctive feeling that it ought not to be possible to commence proceedings seeking monetary compensation for alleged injury and to increase the potential award by putting oneself in a 'worse' position than one was in when the suit was filed. It ought to be an abuse of process for a litigant to use legal proceedings designed to afford relief for a legally defined injury as an event with an uncertain outcome upon which one places a post-filing 'bet', with a view to inflating the award to which the claimant would otherwise have been entitled. At the very least, the timing of such share*

41

> *acquisitions must constitute grounds for this Court, in the exercise of its discretion, declining to grant relief …*

> *33. I find that in all the circumstances of the present case, prior knowledge of the matters complained of in the Petition constitutes a decisive ground for declining to grant relief to the Petitioner as regards its shareholdings which were acquired after the presentation of the Petition.*"

92. The Company argues that the abusive factor in *Kingboard* was that the petitioner had acquired further shares, with knowledge of the matters complained of, with a view to increasing its relief in the event that its claim succeeded; in other words, the petitioner was betting on the outcome of its own claim. The Company contends that the reasoning in *Kingboard* applies with equal force in this case, pointing out that the Short Term Shareholders acquired and/or increased their shareholdings following the Notice (or following the Announcement). Their investments were acquired not just with the suspicion that the transaction forming the basis for relief under section 106(6) might occur, but with knowledge that the transaction would take place. Their investments were acquired as a bet on the appraisal litigation: no less, and no more. They cannot, the Company argues, be in a better position than the petitioner in *Kingboard*, which held a substantial shareholding of the company, and was subject to alleged oppression, before increasing that shareholding.

93. The Court is unable to accept the Company's submission that the exercise of the appraisal rights under section 106(6) in this case by the Short Term Shareholders constitutes an abuse of process. The Court is unable to accept the Company's contention that the use of section 106(6) by the Short Term Shareholders in this case is for a collateral purpose.

94. The Court has held that on a proper construction of section 106(6) the statutory right to request the Court to appraise fair value can be exercised by any shareholder who holds shares that are in fact taken from him by the company as a result of an amalgamation or merger which he did not approve. Accordingly, the Short Term Shareholders have the

42

statutory right under section 106(6) to apply to the Court and seek an appraisal of the fair value of their shares. As Berger V-C held in *Salomon Bros.* the appraisal right given to dissenting shareholders in statutory provisions such as section 106(6) is granted by legislature as the *quid pro quo* for the Company's ability to compulsorily acquire their shares. In the circumstances, it is difficult to see how the exercise of such a statutory right by a dissenting shareholder can be categorised as exercise of a right for collateral purpose or an abuse of process.

95. The Court accepts the Dissenting Shareholders' submission that those who acquire their shares in the knowledge that the shares are likely to be acquired by the majority – and that there is likely to be a dispute as to their value – are just as entitled to that protection as any other shareholder. The fact that they may have invested in pursuit of a profit is neither here nor there: that is true of many (if not all) investors. In this regard, the Court refers again to the judgment of Laster V-C in *In re Appraisal of Dell, Inc.,* No. 9322-VCL, 2015 WL 4313206, at 23 (Del. Ch. July 13, 2015), set out at [54] above.

96. The decision of Kawaley CJ in *Kingboard* does not, in the judgment of the Court, affect the position set out above. First, the Court accepts the submission that there is an important difference between a section 111 petition and an application under section 106(6). The Dissenting Shareholders are not asking the Court to exercise a discretion to award compensation for loss caused by wrongful conduct, or an order that their shares be bought out by an unwilling purchaser. The Dissenting Shareholders are simply shareholders whose shares were taken from them without their consent pursuant to a statutory right to take them. The price that the Company must pay for the right to take the shares is that the shareholder may ask the Court to assess their "fair value". The Dissenting Shareholders are simply exercising that right.

97. Second, the conduct that particularly concerned the court in *Kingboard* was the acquisition of additional shares **after** the filing of the petition alleging that the minority had been oppressed. That is not what happened in the present case. All of the Dissenting

Shareholders acquired their shares not only **before** the amalgamation was voted on but also before the filing of the application for appraisal.

98. Third, nothing in the Dissenting Shareholders' conduct has the effect of "inflating" any liability of the Company. The Company has always had an obligation to pay dissenting shareholders the fair value of their shares. Whether those shareholders are the Dissenting Shareholders or those from whom they acquired the shares is irrelevant to that obligation. Ultimately, the Company will only end up paying the fair value of the shares that it acquired.

99. In all the circumstances and for the reasons set out above, the Court does not consider that the pursuit of the application, by the Dissenting Shareholders, for the Court to determine fair value of their shares under section 106 constitutes an abuse of process.

**E.  Ground 3: Fair Value**

100. In this connection the Company contends that if, contrary to the submissions above, the Court were to hold that (a) the Short Term Shareholders are, as a matter of statutory locus, entitled to commence proceedings under section 106(6), and (b) their claims are not abusive, the question would then arise as to what relief they could expect to obtain at trial.

101. The Company contends that the answer is that, under section 106(6), the court does not appraise the fair value of the Company, or of all its shares, or of a hypothetical share in the Company. Rather, it appraises, as between the relevant parties to the proceedings, the fair value of **the Plaintiff's** shares: this is the inescapable conclusion from the language used in section 106(6), which enables a shareholder to "apply to the Court to appraise the **fair** value of **his** shares".

102. The Company submits that fairness in this context means fair on the facts of the particular case and "*monetary compensation for the injury done*" to the plaintiffs: In re *London*

*School of Electronics Ltd* [1986] Ch 211 at 224 (Nourse J) [G/38/14] and *Scottish Co-operative Wholesale Society Ltd v Meyer* [1958] 3 All ER 66 at 89F (Lord Denning) [G/61/24]. It follows that fair value must necessarily be calculated by reference to the circumstances of each Plaintiff.

103. The Company further submits that an enquiry which takes into account the circumstances in which the shares were acquired is implicit in the notion of fair value, relying upon *Re Bird Precision Bellows Ltd* [1984] Ch 419, at 431c-f [G/30/13]. In determining the fair value of the Short Term Shareholders' shares, the Company argues, the Court will therefore necessarily address the circumstances in which they acquired those shares, that is to say, with the knowledge and desire that they would be compulsorily acquired at US$ 33.00 per share.

104. Having regard to the purpose of section 106(6), the Company submits that the Court must inevitably find that the fair value of the Short Term Shareholders' shares is US$ 33.00 per share. To do otherwise, the Company argues, would be inconsistent not only with the notion of fair value just described but also with *Kingboard*: it is not open to a litigant to increase the size of an action by claiming oppression as a result of buying shares in full knowledge of the matters complained of.

105. The Court is unable to accept these submissions made on behalf of the Company.

106. Firstly, the Court accepts the Dissenting Shareholders' submission that it simply does not follow that the fact that a company says that it will pay shareholders US$ 33 per share if the transaction is approved means that US$ 33 is the "fair value" of those shares.

107. Secondly, as the Company accepts, the appraisal of the fair value of the shares of the minority shareholders who acquired their shareholding prior to the announcement of the amalgamation is a question that must go to trial. In the circumstances, the Court accepts that it makes no sense that the "fair value" of the shares of those shareholders as at the

date of the amalgamation could be determined to be X, but that the "fair value" of the **identical** shares of a different shareholder could be Y.

108. Thirdly, the Court accepts the Dissenting Shareholders' submission that the Company's argument depends on the assertion that, by referring to the fair value of the applicant's shares ("**his shares**"), section 106(6) requires the Court to engage in a subjective assessment of the circumstances of each shareholder, and in particular the subjective circumstances of each shareholder at the time he acquired his shares, so as to determine a personalised "fair value" that is attuned to the particular characteristics of that shareholder. That reads far too much into the term "his shares". The Court accepts that all that term means is that the Court is determining the value of the shares held by the plaintiff – as opposed to the value of a different number or class of shares. It tells one nothing about the basis of assessment.

109. Fourthly, the Court accepts that the assessment to be carried out under s.106(6) is an objective assessment, in the sense that it seeks to determine an objective "fair" value of the shares that is independent of the particular shareholder's character and motivations or factors such as the original timing or motivation of their investments or attitude to risk or investment strategy or negotiating ability. That is the only sensible and workable approach. The Company's approach would produce the astonishing consequence that, in order to conduct an appraisal, the Court would be required to undertake an individual assessment of the circumstances of each shareholder, and the circumstances of the company at the time at which they purchased each of their shares.

110. Fifthly, The Company's suggested subjective approach is inconsistent with the use of the same term – "*the fair value of the shares*" – used in s.106(2)(b) to describe what the Company set out in the Notice. It is obviously not the case that the Company applied a subjective approach when determining the fair value of the shares to be US$ 33 per share. It determined one "fair value" per share that applied to all shares.

111. Sixthly, the Court accepts that the Company's suggested subjective approach is also inconsistent with the approach that has universally been adopted by courts in those

jurisdictions in which issues as to appraisal of the fair value of shares acquired after announcement of a transaction have arisen, including the Cayman Islands, Canadian and Delaware authorities referred to in [47] to [56] above. Those courts have consistently held that the dissenting shareholders' character and motivations, as well as the timing and amount of their investments, are irrelevant to the appraisal jurisdiction.

**F.  Conclusion**

112. For the reasons set out above, the Court dismisses the Company's application for an Order striking out the Originating Summonses of the Dissenting Shareholders who acquired shares after the date of the Notice (or the date of the Announcement), with the knowledge that the Amalgamation was a foregone conclusion, and who acquired those shares as an arbitrage opportunity.

113.  The Court will hear the parties in relation to the issue of costs, if required.

Dated this 20th day of April 2022

_____

NARINDER K HARGUN
CHIEF JUSTICE